**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ALAINA MARIE BYERS,<br><br>    Plaintiff,<br><br>    v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>    Defendant. | No.  2:20-CV-0001-DMC<br><br><br>MEMORANDUM OPINION AND ORDER |

        Plaintiff, who is proceeding with retained counsel, brings this action for judicial review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g). Pursuant to the written consent of all parties, see ECF Nos. 8 and 9, this case is before the undersigned as the presiding judge for all purposes, including entry of final judgment.  See 28 U.S.C. § 636(c).  Pending before the court are the parties' briefs on the merits, see ECF Nos. 17 and 18.

        The Court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to support

a conclusion." Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The Court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence.  See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987). Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

For the reasons discussed below, the matter will be remanded for further proceedings.

## I.  THE DISABILITY EVALUATION PROCESS

To achieve uniformity of decisions, the Commissioner employs a five-step sequential evaluation process to determine whether a claimant is disabled.  See 20 C.F.R. §§ 404.1520 (a)-(f) and 416.920(a)-(f).  The sequential evaluation proceeds as follows:

Step 1   Determination whether the claimant is engaged in substantial gainful activity; if so, the claimant is presumed not disabled and the claim is denied;

Step 2   If the claimant is not engaged in substantial gainful activity, determination whether the claimant has a severe impairment; if not, the claimant is presumed not disabled and the claim is denied;

Step 3   If the claimant has one or more severe impairments, determination whether any such severe impairment meets or medically equals an impairment listed in the regulations; if the claimant has such an impairment, the claimant is presumed disabled and the claim is granted;

|   |   |   |
|---|---|---|
| Step 4 | | If the claimant's impairment is not listed in the regulations, determination whether the impairment prevents the claimant from performing past work in light of the claimant's residual functional capacity; if not, the claimant is presumed not disabled and the claim is denied; |
| Step 5 | | If the impairment prevents the claimant from performing past work, determination whether, in light of the claimant's residual functional capacity, the claimant can engage in other types of substantial gainful work that exist in the national economy; if so, the claimant is not disabled and the claim is denied. |

See 20 C.F.R. §§ 404.1520 (a)-(f) and 416.920(a)-(f).

To qualify for benefits, the claimant must establish the inability to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted, or can be expected to last, a continuous period of not less than 12 months. See 42 U.S.C. § 1382c(a)(3)(A). The claimant must provide evidence of a physical or mental impairment of such severity the claimant is unable to engage in previous work and cannot, considering the claimant's age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. See Quang Van Han v. Bower, 882 F.2d 1453, 1456 (9th Cir. 1989). The claimant has the initial burden of proving the existence of a disability. See Terry v. Sullivan, 903 F.2d 1273, 1275 (9th Cir. 1990).

The claimant establishes a prima facie case by showing that a physical or mental impairment prevents the claimant from engaging in previous work. See Gallant v. Heckler, 753 F.2d 1450, 1452 (9th Cir. 1984); 20 C.F.R. §§ 404.1520(f) and 416.920(f). If the claimant establishes a prima facie case, the burden then shifts to the Commissioner to show the claimant can perform other work existing in the national economy. See Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988); Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986); Hammock v. Bowen, 867 F.2d 1209, 1212-1213 (9th Cir. 1989).

/ / /

/ / /

/ / /

/ / /

## II.  THE COMMISSIONER'S FINDINGS

Plaintiff applied for social security benefits on February 15, 2017.  See CAR 15.[1] In the application, plaintiff claimed disability began on October 10, 2016.  See id.  Plaintiff's claim was initially denied.  Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on September 14, 2018, before Administrative Law Judge (ALJ) Matilda Surh.  At the hearing, Plaintiff amended the alleged onset date to August 1, 2017. In a February 12, 2019, decision, the ALJ concluded plaintiff is not disabled based on the following relevant findings:

1. The claimant has the following severe impairment(s): bilateral knee osteoarthritis, carpal tunnel syndrome, degenerative disc disease of the cervical spine, generalized anxiety disorder, and depressive disorder;

2. The claimant does not have an impairment or combination of impairments that meets or medically equals an impairment listed in the regulations;

3. The claimant has the following residual functional capacity: light work; the claimant can stand/sit/walk for six out of eight hours with frequent climbing of ramps or stairs; she can only occasionally climb ladders, ropes, or scaffolds; she can occasionally kneel, crouch, and crawl; the claimant can engage in frequent bilateral fingering; she is capable of non-complex and routine tasks with one- to three-step instructions; she would be able to complete a normal workday with customary breaks; she can have only occasional public contact;

4. Considering the claimant's age, education, work experience, residual functional capacity, and vocational expert testimony, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

See id. at 17-30.

After the Appeals Council declined review on November 1, 2019, this appeal followed.

/ / /

/ / /

/ / /

/ / /

---

[1]  Citations are the to the Certified Administrative Record (CAR) lodged on March 23, 2020, see ECF No. 12.

4

## III. DISCUSSION

In her opening brief, Plaintiff argues the ALJ failed to provide legally sufficient reasons for finding her testimony and statements not credible. The Commissioner determines whether a disability applicant is credible, and the Court defers to the Commissioner's discretion if the Commissioner used the proper process and provided proper reasons. See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996). An explicit credibility finding must be supported by specific, cogent reasons. See Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990). General findings are insufficient. See Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995). Rather, the Commissioner must identify what testimony is not credible and what evidence undermines the testimony. See id. Moreover, unless there is affirmative evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not credible must be "clear and convincing." See id.; see also Carmickle v. Commissioner, 533 F.3d 1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007), and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

If there is objective medical evidence of an underlying impairment, the Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence. See Bunnell v. Sullivan, 947 F.2d 341, 347-48 (9th Cir. 1991) (en banc). As the Ninth Circuit explained in Smolen v. Chater:

> The claimant need not produce objective medical evidence of the [symptom] itself, or the severity thereof. Nor must the claimant produce objective medical evidence of the causal relationship between the medically determinable impairment and the symptom. By requiring that the medical impairment "could reasonably be expected to produce" pain or another symptom, the Cotton test requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon.
>
> 80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)).

The Commissioner may, however, consider the nature of the symptoms alleged, including aggravating factors, medication, treatment, and functional restrictions. See Bunnell, 947 F.2d at 345-47. In weighing credibility, the Commissioner may also consider: (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent

5

testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5) physician and third-party testimony about the nature, severity, and effect of symptoms.  See Smolen, 80 F.3d at 1284 (citations omitted).  It is also appropriate to consider whether the claimant cooperated during physical examinations or provided conflicting statements concerning drug and/or alcohol use.  See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the claimant testifies as to symptoms greater than would normally be produced by a given impairment, the ALJ may disbelieve that testimony provided specific findings are made.  See Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

At Step 4, the ALJ assessed the credibility of Plaintiff's statements and testimony in determining Plaintiff's residual functional capacity.  See CAR 21-24.  The ALJ stated:

> The claimant is a fifty-year-old female with a high school education.  She alleges she suffers from "osteoarthritis of the knees bone on bone," "anxiety," "depression," "fibromyalgia," and "cervical spondylosis" which significantly affects her ability to perform work related activities.  She takes medications, and some of these cause "extreme sleepiness, dizziness, confusion," weakness, lightheadedness, and muscle weakness (Exhibits 2E; 7E; 10E; and hearing testimony).
>
> The claimant completed a Function Report form dated March 16, 2017, wherein she reported living alone.  She indicated she spends an average day slowing [sic] making her way to the couch where she takes her medications.  She prepares and eats her meals, uses her computer until her medications "kick in," lays on the couch, watches television, and use[s] her computer again later in the day.  She has dogs she cares for with the help of her son, who walks the dogs and takes them to the vet and groomer.  She indicated being limited in her ability to sleep, attend to her personal care, manage medications, go outside, get along with others, lift, walk up to half block, climb stairs, squat, sit, follow instructions, bend, kneel, use her hands, stand, complete tasks, and concentrate.  In addition, she is limited in her ability to handle stress or changes in her routine.  She experiences anxiety in crowded spaces such as stores.  However, she is able to prepare meals, perform household chores (in fifteen-minute increments), drive, go out alone, shop, manage her finances, and spend time with her children.  Moreover, she stated she uses a walker to lift off the couch and wheelchair when shopping or standing for prolonged periods (Exhibit 7E).
>
> The claimant appeared and testified at the hearing, she is unable to work, because of her difficulty walking, stand, writing, and memory.  She explained these are caused by osteoarthritis in her knees, swelling in her feet and ankles, carpal tunnel and generalized pain.  She wears braces on both hands at night, as advised.  She has undergone medication and injection treatment for her knee and other pain complaints.  She has been

> advised she requires bilateral total knee replacements.  She uses a cane for balance and support all the time.  She lives alone but gets help with household tasks and meals from her son and daughter-in-law who live nearby.  However, she can prepare shakes and microwave meals.  She experiences panic attacks several times a week and whenever driving.  She often does not have the motivation to get out of bed or get dressed.  She cries often, lacks motivation to attend to her hygiene, shop, and socialize.  She has good days and bad days with her pain and on bad days spends all day in bed or lying on the couch.  On her good days she spends ninety percent of her day lying down.  She only goes places with her son or daughter-in-law.  She estimated she could lift and carry ten pounds and stand and sit no more than fifteen minutes (Hearing testimony).

CAR 21-22.

In finding Plaintiff's statements and testimony concerning the intensity, persistence, and limiting effects of her symptoms not fully credible, the ALJ stated:

> Despite her impairments, the claimant has engaged in a somewhat normal level of daily activity and interaction.  The claimant admitted activities of daily living including prepare meals, perform household chores (in fifteen minute increments), drive, go out alone, shop, manage her finances, use a computer, care for her dogs, and spend time with her children (Exhibits 5E; 6E; 7E; and hearing testimony).  Some of the physical and mental abilities and social interactions required in order to perform these activities are the same as those necessary for obtaining and maintaining employment.  The claimant's ability to participate in such activities undermines the claimant's allegations of disabling functional limitations.
>
> Additionally, the record reveals since August 2017 the claimant's treatment for both her physical and mental health has remained routine follow up treatment with regular lab testing.  The record reveals the claimant has been prescribed medication for pain and other complaints and had injection treatments.  Overall examinations were unremarkable and noted stable symptoms or unremarkable findings.  While she was offered a knee replacement she declined this in 2018 and indicated another conservative treatment had helped significantly (Exhibit 17F page 9).  In fact, the claimant often reported feeling good and observed to present for appointments in no distress, alert, oriented and/or cooperative (Exhibits 14F page 7; 16F page 44; and 19F page 9).
>
> During her visits, the claimant appeared to be able to communicate concerns and complaints with her providers.  She was noted to be compliant with treatment including medication, lifestyle changes and other mental health treatment.  The record did not indicate she required psychiatric intensive outpatient or hospitalization treatment or evaluation during this time.  In fact, at the hearing the claimant testified she had changed her appointments to telephone visits recently.  Furthermore, the record does not appear the claimant sought out a higher level of care to manage her physical health complaints or concerns.

///

7

Based on this evidence, I find that the claimant's subjective allegations are inconsistent with the medical evidence and other evidence in the record.

* * *

As for the claimant's alleged osteoarthritis of the bilateral knees, evidence in the record reveals the claimant has a lengthy history of bilateral knee pain. Since August 2017, she has sought out continued care for complaints of persistent pain and swelling in her knees. Her examinations at times revealed tenderness and other abnormalities of the knees. She underwent injection treatments and pain medication treatment during this time to manage these complaints. During a visit in 2018, she was noted to deny pain problems due to her knee pain but did note the year before this pain affected her ability to garden and "thrift" shop. She was offered knee replacement surgical care which she declines stating viscous supplementation helped significantly (Exhibits 17F pages 8 to 9; 19F page 9; and 20F pages 21 and 32).

In April 2018, the claimant had x-rays of her knees taken which revealed severe bilateral knee osteoarthritis with small joint effusions (Exhibit 20F page 28).

As for the claimant's alleged bilateral carpal tunnel syndrome, evidence in the record establishes prior to 2017 the claimant had nerve studies revealing evidence of mild to moderate bilateral carpal tunnel syndrome. At that time, she was advised to wear braces bilaterally for several hours at a time. Since August 2017, she sought out continued treatment for complaints of bilateral hand pain, weakness and stiffness. Overall examinations did not reveal abnormalities during her physical examinations (Exhibits 14F pages 23 to 23; 15F; 16F pages 45; and 20F page 13).

In 2018, the claimant had additional nerve studies of the bilateral upper extremities which revealed evidence indicative of mild right carpal tunnel syndrome (Exhibit 14F page 18).

As for the claimant's alleged degenerative disc disease of the cervical spine, evidence reveals since August 2017 the claimant sought out treatment for complaints of neck pain. At times, her examinations revealed tenderness and pain with limited range of motion of the cervical spine. Her symptom complaints were treated with medication and injection treatments (Exhibits 17F pages 1 and 4; and 20F pages 21 and 32).

The claimant had an x-ray of the cervical spine done in April 2018 which revealed no acute osseous abnormality and mild to moderate lower cervical spine degenerative disc disease (Exhibit 20F page 27).

As for the claimant's alleged generalized anxiety and depressive disorders, evidence reveals the claimant has sought out treatment for persistent depression and anxiety since August 2017. During her visits, she reported feeling depressed, withdrawn, anxious, irritable, memory loss, difficulty with understanding, and experiencing panic attacks. Throughout the relevant time period, she underwent regular treatment with both her primary care provider and later mental health experts. This treatment

> included medication treatment which was adjusted on several occasions (Exhibits 10F; 11F; 16F page 23; 18F; and 19F pages 2, 6, and 8)

CAR 22-24.

Plaintiff challenges the ALJ's reliance on her daily activities and course of treatment.

### A.  **Daily Activities**

Regarding reliance on a claimant's daily activities to find testimony of disabling pain not credible, the Social Security Act does not require that disability claimants be utterly incapacitated.  See Fair v. Bowen, 885 F.2d 597, 602 (9th Cir. 1989).  The Ninth Circuit has repeatedly held that the ". . . mere fact that a plaintiff has carried out certain daily activities . . . does not . . .[necessarily] detract from her credibility as to her overall disability."  See Orn v. Astrue, 495 F.3d 625, 639 (9th Cir. 2007) (quoting Vertigan v. Heller, 260 F.3d 1044, 1050 (9th Cir. 2001)); see also Howard v. Heckler, 782 F.2d 1484, 1488 (9th Cir. 1986) (observing that a claim of pain-induced disability is not necessarily gainsaid by a capacity to engage in periodic restricted travel); Gallant v. Heckler, 753 F.2d 1450, 1453 (9th Cir. 1984) (concluding that the claimant was entitled to benefits based on constant leg and back pain despite the claimant's ability to cook meals and wash dishes); Fair, 885 F.2d at 603 (observing that "many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication").  Daily activities must be such that they show that the claimant is ". . .able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting."  Fair, 885 F.2d at 603.  The ALJ must make specific findings in this regard before relying on daily activities to find a claimant's pain testimony not credible.  See Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005).

Plaintiff argues:

> The ALJ found plaintiff not credible in part based on her level of daily activity and interaction. The ALJ noted that plaintiff could prepare meals, perform household chores in 15 minute increments, drive, go out alone, shop, manage her finances, use a computer, care for her dogs and spend time with her children" and that "some of the physical and mental

9

abilities and social interactions required in order to perform these activities are the same as those necessary for obtaining and maintaining employment." Since plaintiff could perform the activities, her allegations of disabling limitations were undermined, according to the ALJ. (Tr. 22.)

Simply because plaintiff was able to perform some activities on a limited basis when her pain or depression was not too severe is not a legitimate basis for finding plaintiff's complaints of disability incredible. The Ninth Circuit has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability. Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001). "Disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations" Reddick v. Chater, 157 F.3d 715, 735 (9th Cir. 1998). "Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity." Cooper v. Bowen, 815 F.2d 557, 561 (9th Cir. 1987). "The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication." Smolen, 80 F.3d 1273, *citing* Fair v. Bowen, 885 F.2d 597, 603 (9th Cir.1989).

The pertinent inquiry is not whether plaintiff was capable of some level of activity generally, but whether the level of activity performed is equivalent to performing competitive work on a sustained, regular and continuing basis, i.e. 8 hours per day, 5 days per week. A plaintiff's daily activities may not be presumed to demonstrate the ability to perform work, rather the ALJ is required to make a specific finding that a claimant is able to spend a substantial part of his day engaged in the pursuit of physical functions which are transferable to a work setting. Vertigan, 260 F.3d at 1050; See also Fair, 885 F.2d at 603 holding "claimant must be able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting." The ALJ made no such finding, nor does the record support that the limited activities cited by the ALJ were performed for a substantial part of plaintiff's day. It is further difficult to see how supposed "activities" such as going out alone, caring for pets or spending time with one's children would be transferable to a work environment in any beneficial way. (footnote omitted).

The restricted manner in which plaintiff performed the cited activities is not compatible with a competitive work environment, where an individual can deviate from assigned tasks no more than 10% of the time before becoming unemployable. (See vocational expert testimony at Tr. 59.) Plaintiff could prepare only simple meals which could be accomplished with minimal exertion in a short period of time, such as protein shakes or microwaved food. (Tr. 46.) Plaintiff reported the ability to perform some chores for only 15 minutes at a time, while she could not perform other chores which were performed for her by her son and daughter-in-law. (Tr. 46.) Plaintiff's ability to use the computer was severely limited as typing or even holding a mouse made her hands cramp up. (Tr. 44.) While plaintiff could drive when she had to, she experienced panic attacks when driving so she generally had her son or daughter-in-law drive her places. (Tr. 46-47.) The record supports only that plaintiff could perform minimal activities with significant difficulty for short periods of time constituting a small part of her day. The majority of

>plaintiff's time, even on good days was spent lying down due to the severity of her pain. (Tr. 55.)

ECF No. 17, pgs. 16-18.

Plaintiff completed a Function Report on March 16, 2017. See CAR 215-23 (Exhibit 7E). Plaintiff describes daily activities which are quite limited. For example, she states that she spends most of her days on the couch. See id. at 217. If she uses the computer, she can only do so for a short time "till my hands cramp up which is about 10 minutes." Id. For meals, she is limited to cereal for breakfast and frozen meals for dinner. See id. While Plaintiff states she waters and feeds her dogs, she also states her son walks her dogs and takes them to needed appointments. See id. As for chores, Plaintiff states she can wash her own dishes "if it's only a couple of them" because she can't stand at the sink very long. Id. at 218. Otherwise, her children help with chores. See id. at 218-19. Plaintiff states that she only drives a car when she must because she experiences panic attacks. See id. at 219.

Citing Plaintiff's daily activities, the ALJ concluded: "Some of the physical and mental abilities and social interactions required in order to perform these activities are the same as those necessary for obtaining and maintaining employment." CAR 22. The ALJ has not, however, indicated how Plaintiff's limited daily activities show Plaintiff is able to perform activities consistent with full-time work. Fair, 885 F.2d at 603. To the contrary, it appears that, while Plaintiff can do some things, what she can do is limited in duration and scope. For example, Plaintiff can only cook simple meals that do not take too long to prepare. Similarly, she can only do dishes for short periods of time, limited by her ability to stand at the sink. As to Plaintiff's computer use, while she has the ability to use the computer, she can only do so for a short period of time due to hand cramping. While Plaintiff states she cares for her dogs, she does so on a limited basis with her son handling the more difficult tasks of walking the dogs and taking them to vet and grooming appointments. And though Plaintiff states she can drive a car, she only does so when necessary due to panic attacks. These various limitations do not indicate an ability to perform activities that are transferrable to a competitive work environment.

///

**B.      Course of Treatment**

According to Plaintiff:

> The ALJ next indicates that plaintiff's symptoms are not as severe as alleged because plaintiff's treatment for both her physical and mental health has remained routine follow-up with regular lab testing, with "medication for pain and other complaints and injection treatments. Overall examinations were unremarkable and noted stable symptoms or unremarkable findings." Additionally, plaintiff declined a knee replacement and indicated another treatment helped significantly, and plaintiff often reported feeling good and was observed to be in no distress, alert, oriented and/or cooperative. (Tr. 22.) This analysis mischaracterizes the evidence.
> First, the 700 pages of medical records in this case demonstrate that plaintiff's treatment is not routine but extensive. Plaintiff has been treated by multiple specialists including rheumatologist Dr. Saharan, psychiatrist Dr. Smith, psychologist Dr. Brusatori, neurologist Dr. Oshtory (and Dr. Prasad previously), cardiologist Dr. Bains, orthopedist Dr. Robinson as well as a primary care physician Dr. Marasigan. Plaintiff has had multiple courses of injections and been tried on multiple medications. There is no indication that plaintiff should have had more intensive treatments for either her mental or physical impairments. While a knee replacement had been recommended, Dr. Robinson reported that there was only a small chance plaintiff would benefit from a knee replacement, and further, she was a poor candidate for total knee arthroplasty given her young age and body habitus (BMI of 39). (Tr. 336-386.) Despite these facts, plaintiff reported to her psychiatrist that she was "stuck" on whether to do it or not, indicating plaintiff gave significant consideration to undergoing a very invasive surgical procedure that would have a poor chance of success given her age and weight. (Tr. 932.) Moreover, while plaintiff did undergo several courses of viscous supplementation injections and corticosteroid injections which helped significantly (albeit prior to the alleged onset date), the record indicates that these treatments stopped working, and plaintiff was noted to have failed conservative treatment and the knee replacement was given as the only remaining option to improve function. (Tr. 299-300.) In February 2018, Dr. Saharan wanted to try the viscous supplementation again, but at hearing, plaintiff testified that Medi-Cal refused the treatment. (Tr. 903, 53.)
> That plaintiff's condition may have been reported as stable, only means that her condition was not worsening, not that somehow her pain or symptomology had lessened in severity. (footnote omitted).  That overall findings were unremarkable is an improper basis to judge plaintiff's subjective complaints. The ALJ conceded that plaintiff has the objectively established severe impairments of bilateral knee osteoarthritis; carpal tunnel syndrome; degenerative disc disease of the cervical spine; generalized anxiety disorder; and depressive disorder. These impairments are substantiated by abnormal X-ray and MRI findings; abnormal EMG/NCS findings, and abnormal findings on repeated mental status examinations, as discussed supra in the summary of medical evidence. Subsequent minimal or unremarkable findings do not detract from plaintiff's credibility because objective evidence need not support the level of severity alleged. "The pain threshold for individuals can vary markedly. Some people suffer the residuals of major physical insult without complaint. Other people suffer pain for unknown reasons in

12

excess of what might be anticipated from the reports in their medical records." Stewart v. Sullivan, 881 F.2d 740 (9th Cir. 1989). The test set out in Cotten v. Bowen, 799 F.2d 1403 (9th Cir. 1991), "imposes only two requirements on the claimant: (1) she must produce objective medical evidence of an impairment or impairments; and (2) she must show that the impairment or combination of impairments *could reasonably be expected to* (not that it did in fact) produce some degree of symptom." Smolen, 80 F.3d at 1282 (emphasis in original). Plaintiff met her burden under the Cotten test, and the ALJ so found in her opinion.

The ALJ cites 3 treatment notes as indicating plaintiff often reported feeling good and presented at appointments in no distress, oriented, and/or cooperative. An examination of these records indicates that plaintiff additionally reported significant symptoms on these dates. At 16F p. 44 (Tr. 892.) despite being alert and cooperative, plaintiff was experiencing numbness and pain secondary to carpal tunnel syndrome, had abnormal physical finding of decreased sensation in a stocking glove pattern, and was referred for additional work up, i.e., a new EMG/NCS test. (Tr. 891.) At 14F p. 7, (Tr. 828) plaintiff was seen for follow up after having the EMG/NCS test and continued to have decreased sensation in a stocking glove distribution and Dr. Prasad prescribed wrist splints and counseled plaintiff on carpal tunnel treatment options. (Tr. 829.) At 19F p. 9 (Tr. 936) plaintiff was seen for initial visit with psychiatrist Dr. Smith. She presented as anxious and talkative and reported current symptoms of anxiety with agoraphobia, depression, avoidance, and panic. (Tr. 935-36.) That plaintiff was cooperative in conveying her symptoms does not detract from the fact that she was experiencing severe symptomology. The mere fact that plaintiff was able to be alert enough to participate meaningfully in 3 appointments with her physicians does not logically support that plaintiff therefore did not have severe symptoms.

The ALJ next finds plaintiff not credible because she was able to communicate concerns with her providers, she was compliant with treatment, and she did not have to undergo psychiatric hospitalization. There is simply no requirement that a plaintiff be unable to communicate or be non-compliant with treatment to be disabled. Similarly, plaintiff's mental health allegations of ongoing panic attacks 2 to 3 times a week and depression so severe that she was unable to get out of bed at times may not be severe enough to require hospitalization (as would active suicidal or homicidal ideation), but may nevertheless prevent full time work. These are rationales without a logical nexus to whether plaintiff's allegations were as severe as alleged.

The ALJ also notes that at hearing, plaintiff testified she had changed her appointments to phone visits as indicating symptoms were improved. However, the records support that the phone appointments began due to increased severity of symptoms, i.e., the phone appointment was set due to plaintiff's significant increase in back pain and to prevent her from having panic attacks from driving to the office.

Finally, the ALJ discredited plaintiff because "the record does not appear the claimant sought out a higher level of care to manage her physical health complaints of concerns." (Tr. 23.) As noted supra, the plaintiff's treatment was appropriate to manage her chronic pain and mental symptomology. She saw multiple specialists and was compliant with their treatment recommendations (except arguably by not getting a knee replacement, which the record supports, was contraindicated due to plaintiff's young age and obesity). The ALJ does not state what "higher level of care" was indicated or why. (footnote omitted). The record shows

13

that despite her debilitating symptoms, plaintiff was diligent in seeing her physicians regularly and in following the instructions of these medical experts.

ECF No. 17, pgs. 18-21.

In discounting Plaintiff's credibility, the ALJ cited Plaintiff's course of treatment, which the ALJ characterizes as conservative. According to the ALJ, Plaintiff often reported feeling good with medication, lifestyle changes, and mental health treatment. The ALJ also noted that Plaintiff has not required hospitalization or intensive outpatient treatment. The ALJ states Plaintiff never sought out a higher level of care. The ALJ also cites Plaintiff's switch to phone appointments.

The Court finds these reasons insufficient on the current record to discount Plaintiff's credibility. As Plaintiff notes, while she underwent several courses of injections, the record indicates that treatment course stopped being effective. For example, in a progress note dated February 3, 2017, it was noted that Plaintiff's knee problems seemed to be mechanical. See CAR 491-92. Knee surgery was discussed, though the doctor stated that it would not be very effective due to "a fair amount of arthritis. . . ." Id. at 492. A February 14, 2017, progress note indicates that Plaintiff was not experiencing any relief from injections. See CAR 299. Knee surgery was again discussed at the time. See id. at 300. While Plaintiff received mostly conservative care, the record reveals that such care was not effective in controlling Plaintiff's pain symptoms. To the extent the ALJ relied on Plaintiff's decision not to undergo knee surgery, that decision is explained given the doctor's advice that the procedure would not be very effective. In sum, evidence of a course of conservative care which is not effective, when coupled with evidence of ineffectiveness of more aggressive treatment, does not undermine Plaintiff's credibility.

/ / /

/ / /

/ / /

/ / /

/ / /

### IV.  CONCLUSION

For the foregoing reasons, this matter will be remanded under sentence four of 42 U.S.C. § 405(g) for further development of the record and/or further findings addressing the deficiencies noted above with respect to the ALJ's analysis of the credibility of Plaintiff's statements and testimony.

Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment, ECF No. 17, is granted;

2. Defendant's motion for summary judgment, ECF No. 18, is denied;

3. The Commissioner's final decision is reversed and this matter is remanded for further proceedings consistent with this order; and

4. The Clerk of the Court is directed to enter judgment and close this file.

Dated:  December 2, 2020

_____
DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE